**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| **v.** | *    **Criminal No. MJM-25-0121** |
| **WARREN WILLIAMS** | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM IN AID OF SENTENCING

 Mr. Warren Williams is scheduled for sentencing on December 19, 2025, following a guilty plea to possession with intent to distribute controlled substances. Pursuant to the plea agreement and Federal Rule of Criminal Procedure 11(c)(1)(C), the parties have agreed to a sentence of 5-10 years' incarceration. For the reasons explained herein, a sentence of 5 years of incarceration followed by 3 years of supervised release is the sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing.

## Introduction

 Very early in this case, Mr. Williams expressed his intention to plead guilty and accept responsibility, and he understands that his past poor decisions require punishment. He is asking the Court to sentence him to a period of 5 years, a significant sentence for him particularly because it will mean spending time away from his very young children, ███████████████████ ████████████████████████████████████████████████████████████████, Mr. Williams understands the pain he is inflicting on his own children by making himself absent from their lives for a lengthy period of time. He blames no one but himself.

 Having persevered through ███████████████████████, the Court can be confident that Mr. Wiliams has what it takes to be successful as a law-abiding citizen going forward. On pretrial release, he graduated from his commercial driver's license (CDL) class to earn his Class A license (something he had been working on during his offense in order to escape

1

from dealing drugs to make money to support his family), he has doubled down on his devotion to his children and significant other, and he has abided by very strict conditions, including leaving his home only to complete school and take care of his children and attend their educational activities. He has maintained perfect compliance for the approximately 8 months he has been on release. As the Court will read in his letter submitted with this submission, his goal is to show his children that "change is real, and that a man can rise from his mistakes with integrity and purpose."[1] Mr. Williams has tried to prove to this Court, too, that he is more than his past and that the Court can trust that he is only moving forward with determination to do right, optimism, and his family by his side.

The purposes of sentencing – retribution, deterrence, incapacitation, and rehabilitation – are all met with a sentence of 5 years of imprisonment and 3 years of supervised release. A sentence of any more than 5 years will not make a meaningful difference to any of those goals, except perhaps pure punishment which risks harmful, counterproductive impacts on Mr. Williams, his children, and his significant other. ██████████████████████████████████████ ████████████, Mr. Williams' own life and circumstances show that applying heavy sentences do not necessarily deter crime; at best they only incapacitate, and at worst, they perpetuate generational poverty, trauma, and crime.

Mr. Williams respectfully requests a sentence at the low-end of the parties' range so that he can get back to proving that he is true to his word and has moved forward from his past.

---

[1] Letter from Warren Williams to the Court, cited in full on pages 9-10.

**<u>Argument</u>**

I.    **Mr. Williams' History And Characteristics Show Someone Who Faced Significant Obstacles As A Child But Has The Perseverance And Determination To Be A Law-Abiding, Productive Citizen.**



For the first part of his life, Mr. Williams lived in the Druid Heights neighborhood of Northwest Baltimore. In the 1990s, Druid Heights was a primarily Black, working-class neighborhood. News articles from the 1990s show a snapshot of a community that suffered from a lack of economic investment, violence, and population decline that depressed the area and made it vulnerable to drugs and crime. *See, e.g.*, Editorial, *Challenging Poverty*, Baltimore Sun (Aug. 18, 2002) (noting that the "once-stable African-American middle-class neighborhoods of West and East Baltimore have largely emptied out . . . . Over the past decade, West Baltimore's Druid Heights, Upton, Harlem Park and Sandtown-Winchester continued rapid decline, losing 23 percent of their population"); Peter Hermann & Howard Libit, *Druid Heights Raiders Nab 9, Get Drugs, Cash*, Baltimore Evening Sun (Sept. 1, 1994) (describing law enforcement raid of 15 homes in Druid Heights community and describing the neighborhood as "the most heavily trafficked area in the Central District"); Johnathon E. Briggs, *Safety - One Step At A Time; Mission: The Druid*

*Heights Peace Patrol Walks The Streets of the West Baltimore Neighborhood To Combat Crime and Drugs and To Help Those in Need*, Baltimore Sun (Apr. 22, 2002) (documenting that from "Jan. 1, 2000, to Dec. 31, 2000, police tallied in Druid Heights three homicides, 20 auto thefts, 73 larcenies, and 72 violent crimes such as muggings, shootings and armed robberies") (all attached as Exhibit C). This reality was not just theoretical to Mr. Williams: he recalls witnessing violence as young as 10 years old.

████████████████████████████, both Mr. Williams and his younger brother left their childhood home. Mr. Williams moved in with an aunt in the Waverly neighborhood of Baltimore, and his younger brother went to his paternal grandparents' house. While he was in a new neighborhood, Waverly was remarkably similar to Druid Heights. Both neighborhoods suffered from the economic depression, heightened police presence, violence, and crime that defined many Black neighborhoods in Baltimore at that time. One local freelance writer for the Baltimore Sun described Waverly in 2001 as follows:

> [Waverly is] a neighborhood in despair. Now the sounds of urban rot in Waverly are heard more loudly and distinctly than ever before. Roving groups of kids wander the streets late into the night, carrying on loud, alcohol- and drug-inspired conversations, shouting over the deafening roar of silence. Police cars, with their screeching tires and blaring sirens, race through Waverly's narrow streets. Sanity-piercing gun shots sometimes puncture the night air; the breaking of glass, too, shatters nerves.

Michael Scarcella, *Decay, Loss Echo Through Waverly*, Baltimore Sun (Apr. 18, 2001).

### II.    Not Surprisingly, Mr. Williams Found His Way To Dealing Drugs To Make Money. While Certainly Serious, There Are Mitigating Aspects Of The Offense Conduct That We Ask The Court To Consider.

Despite these early childhood adversities, Mr. Williams found the motivation to complete high school. He graduated from Northwestern High School in 2011. Following his high school graduation, he took business courses at ITT Technical Institute and then had various employment

during his late teenage and adult years with Safeway, a restaurant, a concrete business, Frito Lay, and with his father.

With the backdrop of his upbringing, Mr. Williams felt pressure to provide for his family, and especially his younger brother. Mr. Williams felt like he grew up in "survival mode" ███████. Having grown up in Druid Heights, where drugs were plentiful, it was easy to get started and easy to pick up when necessary. This path was never his long-term goal. In 2024, inspired by his partner, who drives trucks for a living, he enrolled at the Community College of Baltimore County, in a CDL program. Mr. Williams progressed well in the course.[4] He was scheduled to take his CDL exam on April 24, 2025, but was arrested that day.

Relevant here, over the course of four months in 2025, Mr. Williams sold various quantities of cocaine, fentanyl, and methamphetamines to undercover agents in the Baltimore County area. The purchases started off small (*e.g.*, 7g and 6.6g of cocaine during the first two purchases). Then, as the agents requested larger quantities, Mr. Williams provided larger amounts of each drug. In total, Mr. Williams met with the undercover agents thirteen times. During two of those transactions, Mr. Williams also sold the agents a total of four firearms.

Mr. Williams has pled guilty to a serious crime, and he makes no excuses. In measuring the appropriate sentence, however, we ask the Court to consider several factors:

*First*, Mr. Williams is before the Court for sentencing in a nonviolent drug case and there is no credible evidence that Mr. Williams is a violent individual. This case involves sales to an undercover agent. It is not a case in which violence accompanied drug sales or even where a gun was connected to active street-level drug trafficking or guns were found in a stash house with

---

[4] *See* Exhibit D (evaluations showing Mr. Williams' progress in his CDL program).

drugs. Moreover, Mr. Williams does not have violent prior offenses on his record. He has a 2009 conviction for street-level dealing, and 2010 and 2020 convictions for gun possession related offenses. PSR ¶¶ 30-32. None of this is to excuse Mr. Williams' conduct, but it is important to note that Mr. Williams' case does not involve the level of violence that is sometimes associated with drug cases in federal court. Dealing drugs was simply a way to make a living.

*Second*, Mr. Williams did not propose the sale of firearms to the undercover agent. When the undercover asked Mr. Williams about whether he could purchase a gun, Mr. Williams stated that selling guns was not his thing. Of course, Mr. Williams did obtain and sell four firearms, which is not excusable. But in terms of gauging Mr. Williams' culpability relative to others and his inherent dangerousness or penchant for violence, it is important that he was not in the business of selling guns and it was not originally his idea.

*Third*, these sales were thankfully made to an undercover and never reached the public. The fact that these large amounts of controlled substances never reached the public lessens the harm compared to some cases. There is no evidence that Mr. Williams sold anywhere near the larger amounts he dealt to the undercover at the end of their relationship to the larger public. This case shows that Mr. Williams had the ability to access sources for significant quantities of drugs and for firearms, but it does not show that Mr. Williams was actually dealing to the public in such large quantities or selling firearms to the public.

*Fourth*, the undercover agents continued to purchase controlled substances from Mr. Williams, enlarging the ultimate quantities at issue in this case. In terms of determining whether a downward variance is appropriate, we ask the Court to consider the fact that the Guidelines have been determined by a quantity of drugs the Government controlled.

### III.    The Advisory Guidelines Range Is 121-151 Months' Imprisonment.

The parties agree that the advisory guidelines are 121-151 months' imprisonment, corresponding to offense level 31 and criminal history category II. PSR ¶ 77. The base offense level is 32 given the total quantity of undercover sales. *Id.* ¶ 17. Two levels are added because Mr. Williams possessed firearms during two sales, bringing the adjusted offense level to 34. *Id.* ¶ 18. It is anticipated that Mr. Williams will receive a full 3 levels of acceptance of responsibility credit, making the final offense level 31. *Id.* ¶¶ 24-26. Mr. Williams has three criminal history points, placing him in Criminal History Category II.

### IV.     Mr. Williams Is Genuinely Remorseful And Ready To Move Forward Positively, Most Importantly, To Prove Himself To His Children.

Mr. Williams provided counsel with the following letter to share with the Court. Mr. Williams' words are a genuine testament to his feelings about this case. He has been very clear with counsel from early in the case that he was prepared to accept responsibility, do his time, and return home to his children as soon as possible.

*Dear Your Honor,*

*I write this letter with humility and sincerity, hoping to give the Court a true understanding of who I am and who I am striving to become. My intention is not to excuse my past, but to express my growth, my accountability, and my hope for a second chance to continue building a better life for myself and my family.*

*My path has not been an easy one. From childhood, I learned to survive without the support or guidance many young people depend on. I became a caretaker for my younger brother during my teenage years and into his adulthood, doing my best to provide stability despite the challenges life placed in front of us. Even without a foundation at home, I pushed forward—graduating high school, attending college, and keeping steady employment so I could support myself and those who depended on me.*

*At the time of my arrest, I was working to further my education because I wanted to change my life for the better. While I grew up without guidance, I have learned through painful experience what can happen when you walk the wrong path. At 34 years old, I take full responsibility for my actions. I understand the seriousness of my mistakes, and I accept the consequences that come with them. But I also know that these mistakes do not define the man I am working every day to become.*

*The most personal and important part of my life is my son. Our bond is strong, and he is my greatest motivation to never return to the decisions that brought me here. I want to be the father he can look up to—the father I never had. I want to show him that growth is possible, that change is real, and that a man can rise from his mistakes with integrity and purpose.*

*On May 2, 2025, I earned my CDL-A license. That achievement represents more than a career path—it represents discipline, effort, and hope. I am ready to use that opportunity to secure stable work, provide for my family, and live a life that honors the lessons I've learned. I have a future to build, and I am committed to building it the right way.*

*I am truly grateful for the chance I've had to attend my son's school activities while on home monitoring. Those moments reminded me of what matters most and strengthened my desire to stay on the right path. They are memories I hold close to my heart.*

*Your Honor, in closing, I respectfully ask for mercy and the opportunity to continue this path of growth.*

*All I want is the chance to prove—to my son, to my community, and to this Court—that I can be the man I am working to become. I am committed to change, committed to responsibility, and committed to never returning to the mistakes of my past.*

*Thank you for your time, your consideration, and for allowing me the opportunity to speak through this letter.*

*Warren Williams*[5]

V.   **The Goals Of Sentencing – Retribution, Deterrence, Incapacitation, And Rehabilitation – Weigh In Favor Of A Sentence Of 5 Years' Imprisonment.**

    A.   **A Sentence Of 5 Years Is Punitive, Particularly Given Mr. Williams' Role As An Active Father And Caregiver (§ 3553(a)(2)(A)).**

        1.   **Mr. Williams' Excruciatingly Painful Journey To Becoming A Father.**

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[5] Emphasis added by counsel.





**2.**



---

[7] *Id.*
[8] Exhibit F, Letter from Sasha Abdulkariem to the Court.
[9] Exhibit G, Letter from Cheryl Vines to the Court.



### 3. Mr. Williams' Incarceration Will Be Particularly Punitive For Him Given The Impacts On His Children.

Given this history, a sentence of 5 years will be particularly punitive for Mr. Williams. ▮

Knowing he is responsible for being absent from his own children's lives is personally devastating. The period that Mr. Williams was arrested and detained has already had an impact on the children, especially on the youngest child. Mr. Williams blames no one but himself for this.



---

[10] See Exhibit H, Letter from Tychisa Tanks to the Court.

████████████████████████████████████████████████

Mr. Williams' incarceration will be profoundly felt by his children and significant other. Social science research evidences that children with an incarcerated parent are at substantially higher risk for suffering negative outcomes across every conceivable domain, including health and well-being, academic performance, intellectual development, psychology, behavioral and mental health, poverty, employment and labor market outcomes, vulnerability to violence, victimization and abuse, risk of homelessness, delinquency and criminality, substance abuse, and contact with the criminal justice system.[11] For example, children with an incarcerated father are at higher risk of going to prison than those who grow up in a two-parent household. *See* Kay Hymowitz, "The Real, Complex Connection Between Single-Parent Families and Crime," The Atlantic (Dec. 3, 2012). A Bureau of Justice Statistics report from 1987 found that 70% of juveniles and young adults in long-term, state-operated juvenile institutions did not live with both parents while growing up. *Id.* Another 1994 study of Wisconsin juveniles found that only 13% grew up with their married parents. *Id.* These statistics are alarming.

This point is not hypothetical in this case. ████████████████████████

████████████████████████████████████████████████

██████████████████████████████████.

---

[11] L. Aaron & D. Dallaire, *Parental incarceration and multiple risk experiences: Effects on family processes and children's delinquency*, Journal of Youth and Adolescence 39: 1471-84 (2010); J. Arditti, *Parental Incarceration and the Family: Psychological and Social Effects of Imprisonment on Children, Parents, and Caregivers* (2012); N. Rodriguez, *Bridging the gap between research and practice: The role of science in addressing the effects of incarceration and family life*, Annals of the American Academy of Political and Social Science 665(1): 231-40 (2016); C. Uggen & S. McElrath, *Parental incarceration: What we know and where we need to go*, Journal of Criminal Law & Criminology 104: 597 (2014); K. Turney & R. Goodsell, *Parental incarceration and children's wellbeing*, The Future of Children 28(1):147-164 (2019); M. Comfort, *Punishment beyond the legal offender*, Annual Review of Law and Social Science 3: 271-96 (2007); H. Foster & J. Hagan, *Maternal and paternal imprisonment in the stress process*, Social Science Research 42(3): 650-69 (2013); B. Aiello & J. McCorkel, *'It will crush you like a bug': Maternal incarceration, secondary prisonization, and children's visitation."*, Punishment & Society 20(3):351-74 (2018).

███████████████████████████████████████████████████████

████████████████████

    The impact on Mr. Williams' children will be even more severe because they have been raised with a present, engaged father. Social science research makes this point clear too: "[P]aternal incarceration has a stronger impact on young children who lived with their father before his incarceration than on children who did not live with their father." Julie Poehlmann-Tynan & Kristin Turney, *A developmental perspective on children with incarcerated parents*, 15 Child Development Perspectives (Nov. 2020). Warren Jr. has never known a life without his father, making the transition for him all the more challenging.



4. █████████████████████████████

**5.    Mr. Williams' Incarceration Will Be Very Hard For His Significant Other.**

When Mr. Williams reports to serve his sentence, he may become more of a financial burden (due to prison commissary costs) to his significant other, Ms. Brown, and will not be present to help her with childcare responsibilities, something he is able to share now. Not just that, though. The costs of Mr. Williams' incarceration for Ms. Brown are also likely to impact her physical and mental health. *See* Nazish Dholakia, *Mass Incarceration Is a Public Health Cris*, Vera (June 17, 2025) ("Women with partners who are incarcerated are more likely to experience hypertension, diabetes, heart attack, and stroke."); *see also* Christopher Wildeman et al., *Despair by Association? The Mental Health of Mothers with Children by Recently Incarcerated Fathers*, 77 Am. Soc. Rev. (Feb. 2012) (finding that "recent paternal incarceration increases a mother's risk of a major depressive episode and her level of life dissatisfaction, net of a variety of influences including prior mental health"). As a mother to three young children, Ms. Brown needs Mr. Williams' help. Ms. Brown relies on Mr. Williams for all aspects of parenting, large and small. He takes the children to school, helps them with their homework, cooks, cleans, and attends parent teacher conferences. In Mr. Williams' absence, all of these roles will fall on Ms. Williams, while leaving her as the sole financial provider of the household.

In sum, the active role that Mr. Williams plays in his children's lives as a caregiver and father means that whatever sentence the Court imposes will be punitive. It will be felt not only by Mr. Williams, but also by his children and their mother. The impact of his absence on his family, his community, and himself, all weigh in favor of a sentence of 5 years.

**B.    A Sentence Of 5 Years Affords Adequate Deterrence (§ 3553(a)(2)(B)).**

As evidenced by Mr. Williams' letter and his performance on pretrial release, Mr. Williams has been specifically deterred. Particularly as this is his first federal conviction and, even if the

Court sentences him to 5 years' imprisonment, it will be his longest period of incarceration by far. Prior to this case, Mr. Williams' longest period of active incarceration was 2.5 years. *See* PSR ¶ 32. A sentence of 5 years is exactly double that period. As a matter of proportional punishment, no additional time is necessary.

A sentence over 5 years will have no meaningfully impact from a general deterrence standpoint. The fact that Mr. Williams was caught, prosecuted, and will serve some prison time fulfills the goals of general deterrence and public safety. There is no evidence that additional jail time beyond what Mr. Williams is requesting will provide a meaningful deterrent effect over what has already been accomplished with the fact of conviction alone. *See, e.g.*, Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, 42 Crime & Just. 2013 ("The evidence in support of the deterrent effect of the certainty of punishment is far more consistent and convincing than for the severity of punishment" and that "the effect of certainty rather than severity of punishment reflect[s] a response to the certainty of apprehension."). The Department of Justice's National Institute of Justice has issued its own guidance reflecting that "[i]ncreasing the severity of punishment does little to deter crime" and "[t]he certainty of being caught is vastly more powerful deterrent than the punishment." *See* U.S. Dep't of Just., Off. of Just. Programs, Nat'l Inst. of Just., Five Things About Deterrence 1-2 (May 2016). The reasons for this result are complicated but lay, in part, in recognizing that severe punishment does not "chasten" defendants in the way most people think. "Some policymakers and practitioners believe that increasing the severity of the prison experience enhances the 'chastening' effect, thereby making individuals convicted of an offense less likely to commit crimes in the future." *Id.* "In fact," the guidance notes, "scientists have found no evidence for the chastening effect." *Id.* Research has also found "evidence that prison can exacerbate, not reduce, recidivism." *Id.*

██████████████████████████████████████

██████████████████████████████████████

████████  A longer sentence for Mr. Williams will not meaningfully deter others from engaging

in drug trafficking.[13]

### C.    A Sentence Of 5 Years Protects The Public (§ 3553(a)(2)(C)).

Drug dealing was never a long-term plan for Mr. Williams. He was trying to find a way to

support himself and his family lawfully. That's why he had periods of employment and worked

hard to gain a CDL license. He has earned his CDL Class A license – the highest level of a

commercial license that allows him to operate vehicles with the highest gross vehicle weight

ratings. The license affords Mr. Williams with an excellent opportunity to make a good living. It

expires on March 23, 2033. PSR ¶ 37. He looks forward to being released to begin work as a CDL

driver.[14]

As the above research warns, prison can exacerbate recidivism. The risk, among others, is

that prison can rupture family ties, limit future job prospects, and unnecessarily extend the length

of time someone spends in contact with more serious offenders. *See* Daniel Mears et al., *Recidivism

and Time Served in Prison*, J. Law & Criminology, 83-89 (2016). Here, serving a prison sentence

longer than 5 years risks impeding the strong family ties Mr. Williams has built,[15] will interfere

with his ability to work as a CDL driver, and increases the time he will be surrounded by negative

---

[13] Moreover, the recent very public pardon of President Juan Orlando Hernández, who was convicted of conspiring to import tons of cocaine in the United States and sentenced to a 45-year sentence, undermines any deterrent message that is being sent in individual cases, particularly for low-income Black defendants.

[14] *See* Exhibit J (Letter from Leonard Kelly to the Court); Exhibit K (Letter from Kevin Stovall to the Court).

[15] Incarceration substantially increases the risk of divorce and separation, which has spillover effects into interactions with children of incarcerated individuals. Kristin Turney et al., *As Fathers and Felons: Explaining the Effects of Current and Recent Incarceration on Major Depression*, 53 J. Health & Soc. Behav. 465, 468 (Dec. 2012) (explaining that "[e]ven under the most generous visitation policies, incarcerated men have little opportunity to interact with their children…and after release, fathers are less likely to spend time with children than never incarcerated fathers, and the quality of father-child interaction diminishes, which may be associated with depression.").

influences drawing him back to criminal conduct. Moreover, Mr. Williams' performance on pretrial supervision proves he is no longer a public safety risk.



**D.    A Sentence of 5 Years Provides Needed Training And Treatment In The Most Effective Manner (§ 3553(a)(2)(D)).**

Through his own hard work, Mr. Williams is well on his way to receiving the services he needs to be a law-abiding citizen, and the Court should feel comfortable in sentencing Mr. Williams to a sentence of 5 years' imprisonment followed by a period of supervised release.

Mr. Williams has a proven track record of success on community supervision. After Mr. Williams' arrest in April 2025, he was released on the strictest conditions the Court has at its disposal: home confinement. ECF No. 14. Mr. Williams was restricted to 24-hour-a-day lockdown at his residence except for medical necessities, attorney visits, or court appearances. He was only permitted to leave to complete his CDL program at CCBC and to escort his children to school.



While on pretrial release, Mr. Williams complied with these conditions, with no instances of noncompliance. In May, he received his CDL-A license. Mr. Williams would have been able to obtain a job with his new certification if not for the pretrial restrictions. In August, because of his compliance, Mr. Williams' restrictions were modified to allow him to attend school events and medical appointments for his children. ECF No. 23. As Mr. Williams writes in his letter to the Court, the time he spent on pretrial release for 8 months provided him with a sense of purpose and meaning, while also demonstrating his respect for the law. While he could not provide for his children financially, he was able to show them that he cared, that he was present, and that they were loved.



In Mr. Williams' own words *"[t]hose moments reminded me of what matters most and strengthened my desire to stay on the right path. They are memories I hold close to my heart."*

Mr. Williams' compliance on strict pretrial release conditions demonstrates his ability to comply with the law, even under challenging restrictions. His success on pretrial release means that the Court should have confidence in his ability to have a law-abiding life in the future, and to refrain from an overly punitive sentence for a man who has shown he can change course and respect the law.

<u>**Conclusion**</u>

For the reasons provided above, Mr. Williams respectfully requests the Court to impose the following:

- A sentence of 60 months' imprisonment;
- 3 years of supervised release;
- The standard, mandatory, and special conditions of supervised release;[17]
- No restitution;
- No fine; and
- A special assessment of $100.

Respectfully,

_____/s/_____
Jessica Sawadogo
Maggie Grace
Assistant Federal Public Defenders

---

[16]

[17] The Defense objects to proposed Special Condition #1 that requires Mr. Williams submit to substance abuse testing and pay the costs of testing on the grounds that Mr. Williams has no documented history of substance abuse, and such a condition is not justified by an individualized assessment of Mr. Williams' case.

Office of the Federal Public Defender
Email: jessica_sawadogo@fd.org
Phone: (410) 962-3962

Cc: James Wallner, AUSA
    Paige Cameron, USPO